IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 16, 2020

## STATE OF TENNESSEE v. GARY DEWAYNE GLASGOW

**Appeal from the Criminal Court for Hamblen County**
No. 17CR556        Alex E. Pearson, Judge

———————————————————

### No. E2020-00196-CCA-R3-CD

———————————————————

The Appellant, Gary Dewayne Glasgow, was convicted in the Hamblen County Criminal Court of aggravated assault, a Class C felony, and was sentenced to eight years in confinement. On appeal, the Appellant contends that the trial court committed plain error by ruling he could not introduce the victim's prior inconsistent statement into evidence and that the trial court erred by using an out-of-state conviction to enhance his sentencing range. Based upon the record and the parties' briefs, we find no reversible error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Jonathan M. Holcomb (on appeal and at trial), Morristown, Tennessee, for the appellant, Gary Dewayne Glasgow.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Connie Trobaugh, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

This case relates to the Appellant's beating Jeremy Reed on October 28, 2017. In May 2018, the Hamblen County Grand Jury indicted the Appellant for aggravated assault causing serious bodily injury.

At trial, Sherry Laursen testified that she owned Bud's Sports Bar on North White Pine Road in Hamblen County.[1]  On the night of October 28, 2017, the bar hosted a Halloween costume party.  The Appellant attended the party dressed as a pirate and consumed alcohol.  Angie Reed attended the party with the Appellant.  The victim brought Miranda Tolliver and Ms. Tolliver's mother to the party.  The victim was not wearing a costume and did not drink alcohol.  Ms. Laursen knew the Appellant previously from his "coming in the bar."  She also knew Ms. Reed, Ms. Tolliver, and Ms. Tolliver's mother, but she did not know the victim.

Ms. Laursen testified that Ms. Reed and Ms. Tolliver were "calling each other names" and that they were "going back and forth all night long with it, all night long. Neither one would shut up."  Ms. Laursen asked Ms. Tolliver "to please shut her mouth, to knock it off," and Ms. Tolliver "did so."  The victim left the bar for a few hours and was not involved in the argument.  Later, the victim returned to the bar to pick up Ms. Tolliver and her mother.  The incident between the Appellant and the victim occurred outside at 11:00 or 11:30 p.m., and Ms. Laursen provided a video of the incident to the police.

The State played the video for the jury.  The video showed that Ms. Tolliver exited the bar first and that she was followed by the victim, who was followed by Appellant.  As the victim exited the bar, he held the door open for the Appellant with his right hand.  The victim walked between two vehicles parked in front of the bar, and the Appellant continued following him.  The Appellant said something to the victim.  The victim turned around and faced the Appellant, and the Appellant told the victim something to the effect of, "I'm about to f*ck you up.  You know that, right?"  The Appellant immediately punched the victim's face and continued punching him.  Ms. Tolliver began yelling at the Appellant and told him to stop.  Ms. Laursen came outside, and Ms. Tolliver told Ms. Laursen, "He f*cking just knocked him out, Sherry."

Ms. Laursen testified that she did not see what happened between the Appellant and the victim but that she saw the victim "getting up off the ground" and "bleeding so bad." On cross-examination, Ms. Laursen testified that the Appellant had never been in an altercation at the bar prior to October 28 and that he was "a nice enough guy."

Kimberly Samples testified that in October 2017, she worked at Bud's Sports Bar as a bartender.  Ms. Samples was not working on the night of October 28 but was in the bar "with the rest of the crew, partying for the Halloween costume contest."  Ms. Samples was serving "shots" from a bucket she was carrying.  The victim was there with Miranda

---

[1] According to the statement of the case in the Appellant's brief, a bench trial was held.  However, the record clearly reflects a jury trial.

Tolliver and Tolliver's mother, but he was not drinking alcohol. The Appellant was at the bar with Angie Reed. Ms. Samples knew the Appellant but did not know the victim.

Ms. Samples testified that Ms. Tolliver and Ms. Reed were "arguing back and forth." Ms. Samples went to Ms. Tolliver and asked her to stop arguing, and Ms. Tolliver and Ms. Reed did not say anything else to each other. The victim left the bar but came back inside later to pick up Ms. Tolliver and her mother. Ms. Samples saw the victim and Ms. Tolliver exit the bar. She did not see anything that occurred outside but heard Ms. Tolliver's mother and the Appellant "screaming and yelling" at each other.

On cross-examination, Ms. Samples testified that during the party, the Appellant told her "to put [Ms. Tolliver] in check before he beat [Ms. Tolliver's] and [the victim's] ass." After the incident outside, Ms. Samples went outside and picked up the victim's glasses. She said she had never seen the Appellant act in an aggressive manner prior to October 28.

Miranda Tolliver testified that she was thirty-six years old and that the victim was "a life-long friend." Ms. Tolliver knew the Appellant from Bud's Sports Bar and used to babysit his daughter. On the night of October 28, 2017, Ms. Tolliver was at the Halloween party dressed as a vampire. The victim drove Ms. Tolliver and her mother to the party. He stayed for "a little bit," left the bar, and returned later to pick up the two women. The Appellant was at the bar with Angie Reed, and Ms. Tolliver and Ms. Reed began arguing. The victim was not involved in the argument and never said anything to Ms. Reed.

Ms. Tolliver testified that when the victim returned to the bar to pick up her and her mother, the three of the them walked outside. Ms. Tolliver heard the victim "hit the truck." She turned around and saw the Appellant hitting the victim. She said that the Appellant hit the victim "several" times and that the victim was "like bouncing off the truck." After the incident, the Appellant told Ms. Tolliver, "'It should have been you.'"

Ms. Tolliver testified that the victim's nose and mouth were bleeding and that his face immediately began to swell. Ms. Tolliver drove the victim to her home and "laid him down." One of the victim's eyes was swollen shut, but the victim kept saying he was okay. The victim's face "didn't look right" and "was kind of warped." Ms. Tolliver said that she was "scared to death" all night and that she kept checking on him. The next day, the victim drove to his mother's house, and his mother immediately took him to a hospital in Newport. Medical personnel sent the victim "straight to UT" by ambulance. The victim had surgery to repair his eye sockets and rebuild his cheeks. His jaw was wired shut, and he had to have "a plate put into his skull where it was concaved." The victim was in intensive care for four days, spent eleven or twelve days in the hospital, and experienced a lot of pain. Ms. Tolliver said that before the incident, the victim was "passionate" about his job in

welding, was respectful, and was happy. After the incident, he did not care about his job, was scared and paranoid, and carried a gun. The State asked if the victim carried a gun prior to the incident, and Ms. Tolliver answered, "He did, but not like he does now." She said the victim used to keep his gun in his vehicle.

On cross-examination, Ms. Tolliver testified that she recently gave a statement to law enforcement but that she did not remember saying the Appellant hit the victim from behind as soon as they exited the bar. Ms. Tolliver explained, "I don't know if he hit him or not for sure, but I know that when I turned around, he did hit him. Like he grabbed him." Ms. Tolliver said that prior to this incident, the victim usually carried a gun in the lockbox of his truck. The victim's gun was in the lockbox on the night of October 28. On redirect-examination, Ms. Tolliver testified that the victim did not do anything to provoke the Appellant and that the victim did not say anything to the Appellant or Ms. Reed.

Melissa Ratcliff, Miranda Tolliver's mother, testified that she had known the victim more than fifteen years and that he and Ms. Tolliver were friends. On the night of October 28, 2017, Ms. Ratcliff went to a party at Bud's Sports Bar with Ms. Tolliver and the victim. Ms. Ratcliff knew the Appellant from the bar and had known him about four years. The Appellant was there with Angie Reed, and Ms. Reed and Ms. Tolliver got into "[a] little bicker back and forth." Sherry Laursen asked Ms. Tolliver to stop arguing, and Ms. Tolliver did so.

Ms. Ratcliff testified that at some point, the victim left the bar and was gone for three to four hours. He returned to pick up Ms. Tolliver and Ms. Ratcliff, and he stayed in the bar thirty to forty-five minutes. As the three of them were leaving, Ms. Ratcliff heard "a scuffle or some noise" and heard someone screaming at Ms. Tolliver. Ms. Ratcliff ran outside and saw the victim on the ground. Ms. Tolliver and Ms. Ratcliff took the victim to Ms. Ratcliff's house, and he stayed there all night. The victim's face was swollen and blood was coming out of his nose, but he did not want to go to a hospital. Ms. Ratcliff said she did not hear the victim say anything to Ms. Reed or the Appellant that night.

On cross-examination, Ms. Ratcliff acknowledged giving a statement to an investigator in June 2019 but said she did not remember telling him that "some words were exchanged" between Ms. Reed and the victim. She acknowledged that she used to work at Bud's Sports Bar, that the Appellant would come into the bar, and that he never caused any problems.

Lieutenant David Cribley of the Hamblen County Sheriff's Department (HCSD) testified that about 9:15 p.m. on October 29, 2017, he spoke with Miranda Tolliver on the telephone. The victim was being transported to University of Tennessee (UT) Hospital.

Ms. Tolliver gave Lieutenant Cribley information about the incident at Bud's Sports Bar, and Lieutenant Cribley filed a report.

The victim testified that at the time of trial, he was thirty-seven years old and weighed about one hundred thirty pounds. In October 2017, he weighed about one hundred sixty pounds. On the night of October 28, the victim went to a Halloween party with Miranda Tolliver and her mother. The victim described Angie Reed as a "[f]amily friend" but said he did not know the Appellant. The victim did not say anything to the Appellant at the party.

The victim testified that he left the party but returned later to pick up Ms. Tolliver and her mother. As they were leaving, Ms. Tolliver walked out the door first, followed by the victim. The victim said that he did not remember leaving the bar but that the video showed he was "jumped, hit from behind, 15, 20 times." After the incident, the victim went home with Ms. Tolliver and her mother. He stayed there all night and awoke about 2:00 p.m. the next day.

The victim testified that he drove to his mother's house and that she took him to the emergency room. The victim was transported to UT Hospital by ambulance. He said that his skull was "indentioned about eight to ten millimeters," that the left and right sides of his jaw were broken, and that he had four or five surgeries in four or five days. The victim's mouth was wired shut for four to six weeks, and he was mostly on a liquid diet during that time. The victim lost weight and did not gain it back because he had "a high metabolism." After the wire was removed from the victim's jaw, the victim went to several doctor appointments and had one in-patient surgery. He said that he used to work ten to twelve hours per day, seven days per week, as a self-employed welder and pipefitter but that he no longer worked much.

On cross-examination, the victim testified that he was not carrying a gun on his person on the night of October 28 and that he did not leave the bar to get a gun out of his truck. The victim acknowledged meeting with the State on "Monday of last week." At first, the victim said he never stated during the meeting that he left the bar and got a gun out of his truck. The victim later admitted making the statement. He said, though, that he suffered from permanent brain damage and memory loss, that he did not remember making the statement, and that he did not remember going outside to get a gun. The Appellant acknowledged that he had a gun in his truck during the party. Defense counsel asked, "Did you get the gun and bring it into the bar?" The victim responded, "I can't say that's true or not. No, I don't know that. It's illegal to have a gun in the State of Tennessee, you know, in a bar."

Linda Askew, the victim's mother, testified that she took the victim to the hospital in Newport and that "they sent him straight down to UT to trauma." The victim told his mother that he had been "attacked."

Sergeant Jim Brooks of the HCSD testified that he was assigned to investigate this case on October 30, 2017, and that he spoke with Miranda Tolliver. The next day, Sergeant Brooks obtained a warrant for the Appellant's arrest. After the police arrested the Appellant, Sergeant Brooks obtained video from Bud's Sports Bar. He attempted to speak with the victim, but he could not understand the victim because the victim's jaw was wired shut.

Deputy Joselyn Perez of the HCSD testified that she helped arrest the Appellant and that her body camera recorded his arrest. The State played the video for the jury. On cross-examination, Deputy Perez acknowledged that the Appellant did not resist arrest and that he was "pleasant." At the conclusion of Deputy Perez's testimony, the State rested its case.

Shelly McKee testified that she worked for Bud's Sports Bar in October 2017, that she worked at the bar from 1:00 to 7:00 p.m. on October 28, and that she stayed past her shift for the party. The Appellant was there with Angie Reed, and the victim was there with Miranda Tolliver and Ms. Tolliver's mother. At some point, the victim left. Ms. McKee said that there was "argument back and forth between the women" and that the Appellant told Sherry Laursen that the "constant bickering . . . needed to stop." The Appellant did not threaten anyone.

Ms. McKee testified that the victim returned to the bar to pick up Ms. Tolliver and Ms. Tolliver's mother. As the three of them were leaving, "Miranda yelled a nasty word at Angie and out the door they went." Ms. McKee then saw the Appellant "get up and leave the bar." Ms. McKee did not see what occurred outside. On cross-examination, Ms. McKee testified that she did not hear the victim say anything to the Appellant and that she did not think the victim consumed any alcohol.

Greg Reed testified that on the night of October 28, 2017, he went to the Halloween party at Bud's Sports Bar with his wife and daughter. His sister, Angie Reed, also was there. Mr. Reed said Miranda Tolliver "kept hollering" at his sister and was calling his sister "a whore, a slut, you know, just yelling out." Mr. Reed's wife told an employee, "'You need to take care of this.'" However, nothing was done, and the situation "just kept on escalating."

Mr. Reed testified that he and the victim were "distant kin" and that he saw the victim and Ms. Tolliver go outside. They were gone ten or fifteen minutes and came back inside. Mr. Reed did not see them go outside a second time. However, Mr. Reed went

outside after "everything had done happened" and saw the victim "laid over here to my right." Ms. Tolliver told the Appellant, "You go . . . back inside to the whore you was with." Mr. Reed walked up to Ms. Tolliver and told her, "'Watch who you calling a whore.'" Ms. Tolliver "shoved" Mr. Reed, and Sherry Laursen told Mr. Reed not to hit Ms. Tolliver. Mr. Reed said he did not try to hit Ms. Tolliver, that he was never aggressive toward anyone, and that he never saw the Appellant hit or threaten anyone.

On cross-examination, Mr. Reed testified that he saw the victim lying on the ground. Mr. Reed did not hear the victim say anything to the Appellant that night but heard the victim say "a few remarks" to Mr. Reed's sister.

Angie Reed testified that she and the Appellant went on a date to the Halloween party at Bud's Sports Bar. She said that as soon as they walked into the bar, "certain people started attacking us." She stated that by "certain people," she meant Miranda Tolliver and the people "going along with her." Ms. Reed said that the situation "just kept on escalating" and that the Appellant went to Sherry Laursen several times and asked her to do something about Ms. Tolliver. Ms. Reed's brother, Greg, also asked Ms. Tolliver to calm down. Ms. Reed said that as she and the Appellant started to leave, Ms. Tolliver and the victim were leaving and said "some . . . profanity and things." Specifically, Ms. Tolliver told Ms. Reed that she was going to "beat [Ms. Reed's] ass." Ms. Tolliver also screamed, "Whore." The victim then looked at the Appellant and said, "'And I'm going to whoop your big ass, too.'" The Appellant walked outside, but Ms. Reed stayed inside and did not see what happened to the victim. She did not see the Appellant act aggressively toward the victim.

On cross-examination, Ms. Reed testified that she did not know Ms. Tolliver and had never seen Ms. Tolliver prior to October 28, 2017. At one point that night, Ms. Reed turned around and asked Ms. Tolliver, "'Who are you? I don't even know you.'" Ms. Reed denied cursing at Ms. Tolliver and said she "ignored" Ms. Tolliver. Ms. Reed said that she could hear the victim "in the background, calling me whore and stuff like that."

The Appellant testified that he and Angie Reed went to the party and that he ordered beer. Soon after they arrived, Miranda Tolliver "started in on" Ms. Reed. The Appellant knew Ms. Tolliver and told her to "calm down." Ms. Tolliver told him, "'Get your f-ing whore out of here.'" The Appellant talked to Sherry Laursen three or four times and asked her to "please do something about this." However, Ms. Laursen did not do anything, so the Appellant walked over to the victim and said, "'Hey, can you get your girl under control? This is getting ugly.'" The victim "basically" responded, "Go [f*ck] yourself."

The Appellant testified that about 10:00 p.m., he and Ms. Reed decided to leave. Ms. Tolliver and the victim also were leaving and went outside ahead of them. Ms. Tolliver told Ms. Reed that she was "going to whoop [Ms. Reed's] ass," and the victim told the

Appellant, "'I'll whoop your ass, too.'"  The Appellant followed the victim outside and told him, "'You know I'm about to whoop your ass, right[?]'"  The Appellant testified, "I waited until he turned around and went to reach for something, and I grabbed ahold of him."  The Appellant thought he hit the victim only three times but said the video showed him hitting the victim eleven times.  The Appellant explained that he "had a lot of adrenalin going" because he "was worried [the victim] had a gun [in] his pocket."  After the Appellant hit the victim, he told the victim, "'Good night, Bud[.]'"  The Appellant "set" the victim on the ground and walked away.  The Appellant testified that he hit the victim because he "felt threatened" and that "I wasn't going to walk out that door and let somebody take a shot at me."  The police did not ask the Appellant for his side of the story before they arrested him.

On cross-examination, the Appellant testified that he weighed two hundred ninety pounds on October 28, 2017.  He said many people told him that night that the victim carried a gun.  However, two of those people had "passed away" and were unable to come to trial.  The Appellant acknowledged that as he and Ms. Reed were leaving the bar, the victim held the door for him.  The State asked, "If he was going to shoot you, would he [have] held the door for you?"  The Appellant answered, "He threatened to whoop my ass when he walked by."

The Appellant acknowledged that according to the video, Ms. Tolliver asked him why he hit the victim, and he told Ms. Tolliver that "it was her f-ing mouth."  He also acknowledged telling the police that he hit the victim two times and that the victim got what he deserved.  The Appellant did not mention a gun to the police.  The Appellant admitted having a 2000 conviction in Colorado for possession of marijuana and a 2009 conviction in Colorado for possession of a Schedule II, controlled substance.

At the conclusion of the proof, the jury convicted the Appellant of aggravated assault as charged in the indictment.  After a sentencing hearing, the trial court ordered that he serve eight years in confinement as a Range II, multiple offender.

## II.  Analysis

### A.  Prior Inconsistent Statement

The Appellant contends that the trial court committed plain error by ruling he could not introduce the victim's prior inconsistent statement into evidence.  The State argues that the trial court did not err because the victim admitted making the statement.  We conclude that the Appellant is not entitled to plain error relief.

During defense counsel's cross-examination of the victim, defense counsel asked if the victim was carrying a gun on his person on the night of the party and if the victim left the bar to get a gun out of his vehicle. The victim answered both questions in the negative. Defense counsel asked if the victim remembered meeting with the State on "Monday of last week," and the victim said yes. Defense counsel then asked the victim, "And do you recall telling them that you had a gun in your vehicle at Bud's Bar and when you saw things were getting wild, I believe is what you said, you went and got a gun out of your truck?" The Appellant answered, "I never said nothing like that. I never said nothing about no gun."

Defense counsel requested that the parties approach the bench and advised the trial court that he wanted to play a video of the victim's statement to the State as a prior inconsistent statement. The State responded that defense counsel could not play the "whole" statement, and defense counsel agreed to play "that one part." The trial court sent the jury out of the courtroom and reviewed Tennessee Rule of Evidence 613. Meanwhile, defense counsel prepared the video. The State told the trial court, "Judge under (B), I think I have to have the opportunity to ask him about it first." Defense counsel responded, "I don't mind her asking about it either as long as the truth comes out." The trial court asked defense counsel, "So . . . do we want to play this thing [for] him so he can see it while the jury is out and see if he acknowledges it, that he's going to acknowledge it in front of the jury?" Defense counsel answered that he thought the prior statement was "admissible for the jury to see it." Nevertheless, the trial court had defense counsel play the victim's prior statement for the victim outside of the jury's presence. The following colloquy then occurred:

> [The State]: Jeremy, did you see the video?
>
> THE WITNESS: Yes, ma'am.
>
> [The State]: Do you remember now telling me and Detective Brooks that you did go to the truck and get the gun?
>
> THE WITNESS: I don't remember that, no, but I did see that on the -- like I told you, my short-term memory, my memory because of the permanent brain damage is done.
>
> [The State]: Okay. Do you -- do you remember after watching that, do you agree that you did tell us that?
>
> THE WITNESS: I do agree, yes, after seeing that, yes, I do. But my permanent damage, you know what I mean. My short-term memory is gone.

- 9 -

[The State]: Okay. All right. Thank you.

The trial court advised defense counsel, "I'll allow you to ask him again about that when he comes back out, and pursuant -- we'll follow pursuant to the rule."

When the jury returned to the courtroom, defense counsel resumed his cross-examination of the victim. The following exchange occurred:

Q       . . . . On the night of October 28th, when you arrived at Bud's, did you have a gun in your vehicle?

A       In my vehicle, yes.

Q       And then when you saw or you felt things were getting out of hand, you went out and retrieved the gun, did you not?

A       To the best of my recollection, I don't -- well, as I saw on the video I said that, but my memory is out there. I don't remember -- everything is hearsay, but I did state to the detective that that was what happened, but my memory is, you know, short-term is gone.

Q       Mr. Reed, are you denying that you went out and got the gun out of your car and brought it back in to Bud's with you?

A       No, I'm not denying it, but I don't remember doing all that. To the best of my knowledge I don't remember doing that. Everything is hearsay. I mean, I did see on the video, but I don't remember doing all that, no, I don't.

Q       You agree with me that when you met with the detective and the State of Tennessee, you told them that you had a gun in your vehicle when you arrived at Bud's?

A       Yes.

Q       And when you saw that things were getting out of hand, you went out to your vehicle and retrieved the firearm and brought it back into Bud's?

A       Yes, on the video, yes, I've seen that.

. . . .

Q       Well, where did that statement come from?

A       [J]ust on hearsay and everything else.  The other witnesses that I pieced together.

. . . .

Q       And that's what you believe to be true?

A       What, that I -- that everybody else's statements that I pieced together over two years[?]

Q       That you retrieved . . . the gun out of your vehicle and brought it back into Bud's?

A       I can't say that's true or not.  No, I don't know that.  It's illegal to have a gun in the State of Tennessee, you know, in a bar.

At that point, defense counsel requested to admit the prior statement into evidence, and the State objected because the victim admitted making the statement.  The trial court agreed with the State, saying, "I think that he did what was required of the rule by saying that he did make that statement, he just didn't know if that statement was true or not."

Tennessee Rule of Evidence 613 allows the use of prior inconsistent statements to impeach a witness.  Specifically, Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."  If a party presents a prior inconsistent statement to the witness, the witness "has several possible responses:  the witness can admit, deny, or not remember making all or part of the statement."  Neil P. Cohen et al., Tennessee Law of Evidence § 6.13[5][a] (6th ed. 2011).  If the witness admits making the prior inconsistent statement, extrinsic proof of the statement would be cumulative and, therefore, inadmissible.  Id.  If the witnesses denies or does not remember making the inconsistent statement, extrinsic proof of the statement is admissible.  "[I]t is well-established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of discretion."  State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997).

- 11 -

The Appellant claims that he is entitled to plain error relief on this issue but does not explain why plain error review is necessary. The State notes, "Presumably the [Appellant] contends that this issue requires plain error review because his motion for new trial was not timely filed."

A motion for new trial must be made in writing or reduced to writing within thirty days of the "date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This provision is mandatory, and the time for the filing cannot be extended. Tenn. R. Crim. P. 45(b); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). "If a motion for new trial is not timely filed, all [the appellant's] issues are deemed waived except for sufficiency of evidence and sentencing." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Tenn. R. App. P. 3(e)). Moreover, the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal. Therefore, an untimely motion for new trial often will also result in an untimely notice of appeal. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987).

The trial court sentenced the Appellant on December 16, 2019, and entered the judgment of conviction that same day. The Appellant filed his motion for new trial thirty-one days later on January 16, 2020. As a result, his notice of appeal, which he filed on February 3, 2020, also was untimely. In the interests of justice, we have decided to waive the timely filing of the notice of appeal in this case.

Because the Appellant late-filed his motion for new trial, we can only review this issue for plain error. An error rises to the level of plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks and citation omitted).

Turning to the issue, defense counsel confronted the victim with his prior statement by asking him, "And do you recall telling [the State last Monday] that you had a gun in

- 12 -

your vehicle at Bud's Bar and when you saw things were getting wild, I believe is what you said, you went and got a gun out of your truck?" The victim unequivocally denied making the statement, saying, "I never said nothing like that. I never said nothing about no gun." At that point, the prior statement was admissible to impeach the victim pursuant to Tennessee Rule of Evidence 613(b), and defense counsel should have been allowed to play the prior statement for the victim in front of the jury. Defense counsel then could have given him the opportunity to explain the prior statement, or the State could have asked him to explain the statement on redirect-examination. See Neil P. Cohen et al., Tennessee Law of Evidence, § 6.13[5][b] (6th ed. 2011).

Although the Appellant did not get to play the victim's prior statement for the victim in front of the jury, we conclude that the Appellant is not entitled to plain error relief. Before the jury left the courtroom, defense counsel read the victim's prior statement to him, and the victim adamantly denied making the statement. When the jury returned to the courtroom, the jurors learned from the victim that his prior statement had been played for him. The victim then admitted several times in front of the jury that he told the State he went out to his truck and got his gun, and he explained that he did not remember making the statement because he suffered from memory loss. Therefore, we think defense counsel effectively impeached the victim and that a substantial right of the accused was not adversely affected.

Moreover, the Appellant testified that many people told him the victim was carrying a gun that night. He also testified that he hit the victim because he thought the victim had a gun in the victim's pocket and because he thought the victim was going to shoot him. The trial court instructed the jury on self-defense. The video, though, shows that Tolliver and the victim were leaving the bar just prior to the incident and that the Appellant followed them outside. The video does not show anything amiss between the victim and the Appellant as they exited the bar, and the victim even held the door open for the Appellant. As Tolliver and the victim walked away from the bar, the Appellant followed them and said something to the victim. The victim turned around and faced the Appellant. The Appellant, who was noticeably larger than the victim, told the victim that he was "about to f*ck you up" and began punching the victim's face.[2] After the attack, the Appellant told the victim, "'Good night, Bud.'" The Appellant did not tell the police that he repeatedly hit the victim because he thought the victim had a gun or because he thought the victim was going to shoot him. Instead, he told the police that he hit the victim only two times and that the victim got what he deserved. Accordingly, we also conclude that consideration of the error is not necessary to do substantial justice.

---

[2] At sentencing, the trial court stated that the video showed the Appellant "pulverize[ing]" the victim and that "we need to take into consideration the size difference."

B. Sentencing

The Appellant claims that the trial court erred by using an out-of-state conviction to enhance his sentencing range because there was "no indication" he was represented by counsel at the time of his guilty plea for the prior conviction.[3] The State argues that the trial court properly sentenced the Appellant. We agree with the State.

Before trial, the State filed a Notice of Intent to Seek Enhanced Punishment. In the notice, the State claimed that the Appellant qualified as a Range II, multiple offender based on his two prior Colorado convictions. For the first conviction, the Appellant was convicted in August 2000 of possession of marijuana and received a six-year sentence. For the second conviction, the Appellant was convicted in June 2009 of possession of a Schedule II, controlled substance and received a three-year sentence.

At the Appellant's sentencing hearing, the State noted that it asked the Appellant about the convictions at trial and that he "admitted to both of those." Defense counsel responded that for the 2000 conviction, the State failed to show a valid conviction. Defense counsel explained,

> That is all of the documents attempting to establish that he has a valid conviction in that case. There [are] several places for Mr. Glasgow to waive his right to an attorney. It claims that an attorney was -- explained things to him, all the things that go on with all the waivers we always do but, if you will notice, Mr. Glasgow did not in fact have an attorney. And both places where <u>defense</u> counsel could would sign off is bare.

The trial court reviewed the certified copy of the 2000 judgment of conviction and the certified copies of documents submitted with the judgment. The trial court stated that according to the judgment, Christopher Calbo represented the Appellant. Therefore, the trial court determined that it could consider the prior conviction to determine the Appellant's range of punishment. At the conclusion of the hearing, the trial court found that the Appellant qualified as a Range II, multiple offender and sentenced him to eight years in confinement.

Relevant to this case, a trial court may sentence a defendant as a multiple offender if the court finds beyond a reasonable doubt that the defendant has received "[a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class,

---

[3] The Appellant asserts that this issue also must be reviewed for plain error. However, as noted by the State, sentencing issues are reviewable notwithstanding an untimely motion for new trial. <u>See</u> <u>State v. Baugh</u>, 152 S.W.3d 453, 460 (Tenn. 2004).

a higher class, or within the next two (2) lower felony classes[.]" Tenn. Code Ann. § 40-35-106(a)(1), (c). "Prior convictions include convictions under the laws of any other state, government or country that, if committed in this state, would have constituted an offense cognizable by the laws of this state." Tenn. Code Ann. § 40-35-106(b)(5).

> The original or certified copy of the court record of any prior felony conviction, bearing the same name as that by which the defendant is charged in the primary offense, is prima facie evidence that the defendant named in the record is the same as the defendant before the court, and is prima facie evidence of the facts set out in the record.

Tenn. Code Ann. § 40-35-202. Moreover, "reliable hearsay including, but not limited to, certified copies of convictions or documents, may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted." Tenn. Code Ann. § 40-35-209(b).

A defendant found to be a multiple offender "shall receive a sentence within Range II." Tenn. Code Ann. § 40-35-106(c). The burden is on the State to establish a defendant's sentencing status. State v. Jones, 901 S.W.2d 393, 397 (Tenn. Crim. App. 1995). This court reviews the range of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012).

In Baldasar v. Illinois, 446 U.S. 222 (1980), a majority of the United States Supreme Court held that a prior uncounseled misdemeanor conviction could not be used to enhance a subsequent misdemeanor conviction into a felony. Relying on Baldasar, this court held in State v. O'Brien, 666 S.W.2d 484, 485 (Tenn. Crim. App. 1984), that a prior conviction of driving under the influence (DUI) could not be used to enhance the punishment for a subsequent DUI conviction unless the record of the first conviction affirmatively demonstrated that the defendant was either represented by counsel or waived his right to counsel. After O'Brien, though, the United States Supreme Court overruled Baldasar in Nichols v. United States, 511 U.S. 738, 748-49 (1994). Nevertheless, the Supreme Court reaffirmed in Nichols that an uncounseled conviction could not be used to enhance punishment for a subsequent conviction unless, under Scott v. Illinois, 440 U.S. 367 (1979), no prison term was imposed for the uncounseled conviction or the defendant waived his right to counsel. Nichols, 511 U.S. at 748-49.

In support of his argument that the trial court erred by using his 2000 conviction to enhance his range of punishment, the Appellant cites State v. Fusco, 404 S.W.3d 504 (Tenn. Crim. App. 2012). In that case, the defendant claimed, as the Appellant claims in this case, that the trial court erred by using his prior out-of-state convictions to enhance his

range of punishment because the State did not show that he was represented by counsel at the time of the prior convictions. Fusco, 404 S.W.3d at 531. The Fusco court addressed the issue as plain error because the defendant failed to raise it in the trial court and reviewed the relevant line of cases, including Baldasar, O'Brien, and Nichols. Id. at 532-36. However, this court concluded that plain error relief was not warranted because the "precise" issue presented by the defendant, i.e., whether the rationale of Baldasar and O'Brien applied to convictions used for range-determination purposes, was not clear; therefore, no clear and unequivocal rule of law was breached. Id. at 535.

Regardless of the state of the law on the issue, this case is distinguishable from those previous cases. Here, the 2000 judgment of conviction and the documents submitted with the judgment reflect that the Appellant was represented by counsel. Specifically, the judgment of conviction and the sentencing order for the conviction, both of which were signed by the trial judge, provide that the Appellant was represented by Christopher Calbo. Moreover, on the acknowledgment of rights form, signed by the Appellant, the Appellant initialed the line that stated, "I have fully discussed my case with my attorney, including the rights referred to in paragraph five (5) above. I am satisfied with the representation and advised provided to me by my attorney." He also initialed the next line that stated, "After consulting with my attorney I have chosen to enter (a) plea(s) of guilty[.]" Although the line for defense counsel's signature is blank on an acknowledgement of rights form and on an addendum to the form, the record does not support the Appellant's claim that there is "no indication" he was represented by counsel. To the contrary, the record affirmatively shows that he was represented by counsel. Therefore, we conclude that the trial court did not abuse its discretion by sentencing the Appellant as a Range II, multiple offender.

## III.  Conclusion

Based upon the record and the parties' briefs, we find no reversible error and affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE